**Electronically Filed**
**Intermediate Court of Appeals**
**CAAP-19-0000585**
**20-NOV-2020**
**07:58 AM**
**Dkt. 70 OP**

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

---o0o---


STATE OF HAWAI'I, Plaintiff-Appellee, v.
EPHRIM RICHARD FORBES, Defendant-Appellant


NO. CAAP-19-0000585


APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CRIMINAL NO. 1CPC-18-0000836)


NOVEMBER 20, 2020


LEONARD, PRESIDING JUDGE, AND WADSWORTH, J., WITH
HIRAOKA, J., CONCURRING AND DISSENTING IN PART


OPINION OF THE COURT BY LEONARD, J.

In State v. Sheffield, 146 Hawai'i 49, 60, 456 P.3d 122, 133 (2020), the Hawai'i Supreme Court held that a circuit court plainly erred when it failed to instruct a jury that the restraint necessary to support a conviction for Kidnapping under Hawaii Revised Statutes (**HRS**) § 707-720(1)(d) (2014) must be restraint that is more than incidental to an accompanying crime.

The supreme court did not address the restraint necessary to support a conviction for Kidnapping based on other subsections of the Kidnapping statute. Here, we address the restraint necessary to support a Kidnapping conviction under HRS § 707-720(1)(e) (2014), and based on the supreme court's rationale, we hold that the restraint necessary to support a conviction for Kidnapping under HRS § 707-720(1)(e) must be restraint that is more than any restraint incidental to the intended terroristic threatening of the complaining witness. Accordingly, and based on the record in this case, we further hold that the trial court plainly erred in failing to give such an instruction, and that this error was not harmless beyond a reasonable doubt.

Defendant-Appellant Ephrim Richard Forbes (**Forbes**) appeals from the August 8, 2019 Judgment of Conviction and Sentence (**Judgment**), which was entered by the Circuit Court of the First Circuit (**Circuit Court**).[1] Forbes challenges his conviction for Kidnapping, in violation of HRS § 707-720(1)(e).

I.    BACKGROUND

An Oʻahu grand jury indicted Forbes for: (1) Kidnapping under HRS § 707-720(1)(e);[2] (2) Robbery in the First

---

[1]    The Honorable Karen T. Nakasone presided.

[2]    HRS § 707-720 provides, in relevant part:

> **§ 707-720 Kidnapping.** (1) A person commits the offense of kidnapping if the person intentionally or knowingly restrains another person with intent to:
> . . . .
> (e)   Terrorize that person[.]

2

Degree under HRS § 708-840(1)(b)(i) (2014) (**Robbery**);[3] and

(3) Unauthorized Control of Propelled Vehicle (**UCPV**) under HRS

§ 708-836 (2014).[4] After a jury trial, Forbes was convicted of

Kidnapping and UCPV. Count 2 (Robbery) was dismissed.

Forbes's conviction was based, in part, on the

following evidence. The complaining witness (**CW**) was a taxi

driver who testified at trial through a Japanese interpreter. CW

testified that, on May 17, 2018, he was dispatched to the Hampton

Inn near Kapolei. He was told that his fare wanted to go to the

airport. Forbes was sitting on the sidewalk when CW arrived at

the Hampton Inn. CW testified that when Forbes got into his van,

"It was kind of smelly so I didn't feel -- I didn't have kind of

a good feeling." CW also "didn't like" the fact that Forbes was

sitting on the ground.

---

[3]     HRS § 708-840 provides, in relevant part:

> **§ 708-840 Robbery in the first degree.** (1) A person commits the offense of robbery in the first degree if, in the course of committing theft or non-consensual taking of a motor vehicle:
>
> . . . .
> (b)    The person is armed with a dangerous instrument or a simulated firearm and:
>
> (i)    The person uses force against the person of anyone present with intent to overcome that person's physical resistance or physical power of resistance[.]

[4]     HRS § 708-836 provides, in relevant part:

> **§ 708-836 Unauthorized control of propelled vehicle.** (1) A person commits the offense of unauthorized control of a propelled vehicle if the person intentionally or knowingly exerts unauthorized control over another's propelled vehicle by operating the vehicle without the owner's consent.

The State moved into evidence a video recording of the interior of CW's van taken by a camera mounted on the windshield. The video showed CW and Forbes inside the van. The video was played for the jury, accompanied by the following audio:

Speaker 1: Hello? Are you (indiscernible)?

Speaker 2: (Indiscernible).

Speaker 1: No. Richard?

Speaker 2: (Indiscernible).

Speaker 1: Richard. You go to airport?

Speaker 2: (Inaudible).

Speaker 1: Okay. Which airline? Hm?

Speaker 2: (Inaudible).

Speaker 1: Hawaiian. Okay.

Speaker 2: (Indiscernible.)

Speaker 1: Hm?

Speaker 2: (Indiscernible). Hello? Hello? (Indiscernible) to the airport. (Indiscernible).

Speaker 1: I can go to airport now so --

Speaker 2: Huh?

Speaker 1: I can go to airport. No?

Speaker 2: (Indiscernible) still get a free ride (indiscernible).

Speaker 1: No, no, no. I don't want to take to -- I don't want to take to, you know.

Speaker 2: (Indiscernible), okay?

Speaker 1: (Indiscernible) one? So where are you like to go?

Speaker 2: (Indiscernible) keep going.

Speaker 1: Kapolei?

Speaker 2: Yeah. Yeah.

Speaker 1: Ko Olina, right?

Speaker 2:  (Indiscernible).

Speaker 1:  Which one?

Speaker 2:  Campbell.

Speaker 1:  Campbell.

Speaker 2:  (Indiscernible) go to the very end.

Speaker 1:  No.  I don't think so.

Speaker 2:  (Indiscernible).

Speaker 1:  (Indiscernible) yeah?

Speaker 2:  (laughing)  No, further.  (Indiscernible).

Speaker 1:  (Indiscernible) here?

Speaker 2:  No.  Turn by (indiscernible).

Speaker 1:  Here?

Speaker 2:  (Indiscernible).

Speaker 1:  Yeah, not here maybe.

Speaker 2:  Hit it, hit it.  Keep going.  Keep going, going (indiscernible).

Speaker 1:  No, no.  It's not (indiscernible).

Speaker 2:  It's okay (indiscernible) *turn around.  Go back to the bridge.  The beach park is right there.*

Speaker 1:  No.  Please.  Please.

Speaker 2:  *Turn around.  Hey.  Turn around.*

Speaker 1:  I'm sorry.

Speaker 2:  *Turn around.*

Speaker 1:  Okay, okay.

Speaker 2:  *Turn the fuck around.  Now.*

Speaker 1:  Okay, okay, okay.

Speaker 2:  *Put your hands up.*

Speaker 1:  Okay.

Speaker 2:  *Put your other hand up.*

Speaker 1:  Yeah.  I'm sorry.

Speaker 2:  *Keep going.*

Speaker 1:    Okay.

Speaker 2:    Keep going straight.

Speaker 1:    Take it.   Take it money [sic].

(Video stopped.)

(Emphasis added).

CW testified that, as he began driving toward the airport, Forbes said he was going to Hawaiian Air.  After about 15 minutes, Forbes told CW to drive to Hale'iwa (located on the other side of the island of O'ahu).  CW declined to drive to Hale'iwa because he did not like to go that far; it was a "less popular place, kind of remote area."  Forbes asked where CW wanted to go.  CW responded, "Ko Olina."  Forbes told CW to drive to Ko Olina (which is near Kapolei, where Forbes had been picked up).  CW turned around and began driving toward Ko Olina.  After ten to fifteen minutes, Forbes asked CW to take him to Campbell Industrial Park.  Forbes began talking to his phone.  At the end of the video, Forbes pulled the camera off the van's windshield.  CW was then asked:

Q.    What was going through your mind at that time?

A.    *I was scared.*

Q.    What were you scared of?

A.    Before that *he showed his gun and then ordered me to drive on, that's why.*

Q.    In your mind what did you think could happen?

A.    *I felt I may be shot.*

.  .  .  .

Q.    Now let's talk about what happened after the defendant took the camera off.  How much longer did you drive with the defendant in your car?

6

A.    *When he showed me the gun and also broke the camera, video camera, it's about three to five minutes that I drove, continued driving.*

.  .  .  .

Q.    Okay.  Tell the jury exactly what happened after he took the camera off.

A.    Anyway I was ordered to continue driving.  Then -- so I -- *I tried to run away so I opened the door and then one step outside the -- the van, however, he pulled me back into the car.  So first time I was -- I was holding my bag cash in* [sic]*, so tried to get out with my cash bag.  Then I got pulled back so second time I gave up the cash bag, dropped it.  Then I run away.*

Q.    Okay.  Did -- did you ever see the defendant with a gun?

A.    Yes.

Q.    Describe to the jury exactly what you saw with regard to the gun.

A.    First of all, *after showing -- showing the gun to me, he sat down deep in his seat and then just kind of holding the gun towards me.  Then when I tried to run away from the car he used his gun and then the grip side, holding side, and hit my neck side, neck, and then -- so that's -- that's why I kind of -- I gave up running away at the time.*

Then right after that I drop my cash bag.  *Then I try to run away again.*

Q.    Okay.  Describe to the jury the way the defendant was holding onto your cash bag.

A.    When I -- *first time I was trying to run away, he was just holding onto me.*  He wasn't holding to that bag or cash bag.

Q.    And then what made you think that he was trying to get your cash bag?

A.    Is that the time when he aim at me with his gun how I felt, I mean, about the money bag?

Q.    Okay.  Describe to the jury how the defendant was holding you and pulling you into the car.

A.    *He grabbed me at underarm here with my shirt and he pulled me back into the car.*

Q.    And where was your cash bag at that time?

A.    I was holding the bag on [sic] my right hand.

Q.    Okay.

A.   At the time.

Q.   So you're holding your cash bag with your right hand.  Which side is the defendant pulling you on?

A.   I was trying to get out of the driving side, get out, and so *he pulled me back from the right-hand side, underarm side, and then pull me back into the car.*

Q.   Okay.  But after you -- how was it that your cash bag came off of your body?

A.   I think I let it go, fall onto the floor.

Q.   And at that point were you able to get out of your van?

A.   Yes.

Q.   Because at that point the defendant released his grip on you?

A.   I think it was like that.

(Emphasis added).

CW testified that he then asked for help from the driver of a vehicle behind his van.  He got into the passenger side of the car and watched his van being driven away.  He had left his money bag on the floor of the van.

About ten minutes later, with the police, CW saw his van and Forbes at Barbers Point Beach Park, where he identified Forbes to the police.  Photographs of the injuries CW sustained when Forbes pulled at him, and when Forbes hit him with the "gun," were admitted into evidence without objection.  They depict a scratch and an area of bruising on CW's right arm, as well as a small mark above CW's right temple and what appears to be bruising on his left ear.  Photographs of CW's van, personal possessions, cash bag, and cash were also admitted into evidence without objection.

On cross-examination CW testified:

> Q. But do you recall how -- you never told this officer that you were restrained by Mr. Forbes?
>
> A. I -- I recall that I told the police -- police officer that I had to drive under the sort of duress of the -- under the -- the defendant's holding a gun against me.
>
> Q. Okay. That you had to drive while the defendant was holding the gun, is that what you just said?
>
> A. That's right.
>
> Q. Because haven't you repeatedly said that there's only something that you thought was a gun that was brought out after you stopped the taxi in the middle of the road?
>
> A. I recall after being kind of shown the -- the -- the pistol or gun that I think still I drove about five minutes or so afterwards.
>
> Q. Okay. Do you remember testifying in this very courtroom . . . that Mr. Forbes never asked you for any money throughout the entire incident?
>
> A. That's correct.
>
> Q. I see. *And you told Mr. Forbes that you didn't want to take him any further?*
>
> A. *That's correct.*
>
> Q. *And it was only after you told him you didn't want to take him any further that he brought out what you thought was a gun?*
>
> A. *Yes.*
>
> . . . .
>
> Q. Do you recall that you told the detective once again that your arm wasn't grabbed but that he -- he had a hold of your clothing?
>
> A. Yes.
>
> Q. Okay. And then he released you and you ran from the van?
>
> A. The -- *first I was tried to run away and he grabbed me back into the car so I gave up and drove about five minutes or so.* Then *second time I tried to run away but then at that time I dropped my cash bag so maybe that -- that's how I could run away.*
>
> . . . .

> Q. But you dropped the cash bag in your van?
>
> A. So after dropping, just before -- *just before I run away I dropped the bag.*
>
> Q. And -- okay. And then that's when you got out of the -- you were able to get out of the van?
>
> A. That's right.
>
> Q. Do you recall testifying in front of the Grand Jury?
>
> A. Yes.
>
> Q. And . . . [d]o you recall telling the Grand Jury that you thought that the gun was fake because it was so tiny?
>
> A. Yes.

(Emphasis added).

> On re-direct examination, CW testified:
>
> Q. How -- I want to be very clear about what happened after the defendant pulled the camera from your car.
>
> A. *After that the camera was removed I tried to run away by opening my side of door, but he grabbed me back into the car so then I started to drive for while. And then there was again sort of a struggle between us and that's the time I could run away,* so that's how it developed.
>
> Q. And how many minutes later were you able to finally run away?
>
> A. I think it was *about five minutes.*
>
> Q. Okay. And *that's only after you released your cash bag?*
>
> A. *That's right.*

(Emphasis added).

The State called several other witnesses, including the Hampton Inn employee who had called the taxi for Forbes, the police officers who investigated the case, and a witness who saw Forbes drive CW's van into Barbers Point Beach Park, park the van, search the van's interior, remove three bags, and walk

toward a canal. The State rested. Forbes moved for judgment of acquittal, which was denied.

Forbes then testified in his own defense. Forbes stated that, on May 17, 2018, he was going to meet his boss, whose name was Bobby, at the airport about a job at the nearby Navy housing. He did not have a car, so he called for a taxi. The driver was "fidgety." Forbes, who is Black, thought he was being profiled. It made him feel "[u]ncomfortable."

As they were headed to the airport, he received a call from Bobby about a pickup in Hale'iwa. He told CW he needed to go to Hale'iwa. CW refused. Forbes called Bobby and told him the cab driver was not going to take him to Hale'iwa. Forbes told CW to drive "down to the beach park by Campbell Industrial, 'cause I know [Bobby] likes to go over there and get breakfast sometimes." Forbes said he then fell asleep in the van.

As the van approached Barbers Point Beach Park, Forbes told CW go to the end of the road and make a turn to get to the park. CW turned down the wrong street and got really nervous. Forbes testified:

> Q.    So he went down -- he took a wrong turn?
>
> A.    He took a wrong turn and that woke me up 'cause I felt he took the wrong turn and I told him to go down one street down further and he did that. And so when we got on Ohai (sic) Street he proceeded immediately getting close to the entrance of the park, I could see it from here to the door. Then he turned around.
>
> Q.    Okay.
>
> A.    And then when he turned around, made to look back and got nervous, and I don't know what the hell he was going to do so I got upset.

11

Q.      You were upset?

A.      I was upset.

Q.      Okay.  Then what happened?

A.      Then things got out of hand.

Forbes testified that CW stopped the van in the middle of the roadway "two businesses down from the beach park."  Forbes grabbed CW's shirt because he wanted CW to drop him off at the beach park.  Forbes testified:

Q.      Okay.  Did you grab his shirt?

A.      Yes, sir.

Q.      Why did you grab his shirt?

A.      'Cause I wanted him to drop me off.

Q.      To complete the ride?

A.      Yes, sir.

Q.      Did you let go of his shirt?

A.      I did.

Q.      Why did you let go of his shirt?

A.      'Cause it was -- I didn't want to put up a fight with him.  It was retarded.  It was just retarded.

Q.      Then what happened?

A.      Then I told him -- then I pulled out my -- my cigarette lighter that I had, *I scared him just because he scared me, to see if he's going to turn around and drop me off.*
.  .  .  .

Q.      Could you describe that for the ladies and gentlemen of the jury.

A.      Cigarette lighter is -- is -- was my cigarette lighter for -- *looks like a handgun* because they do make those like so, and *that's what I used to scare him.*

.  .  .  .

Q.      What happened after you let him go and he -- you released his shirt?

A.      I released his shirt.

Q.      Then what --

A.      I got out the cab.  And since I wasn't that far
I got in the front seat and I drove myself to my
destination.

        . . . .

Q.      Where did you -- where did you park the van in
the --

A.      In the beach park.

Q.      In the beach park --

A.      Yes, sir.

Q.      -- parking lot?

A.      Yes, sir.

Q.      What did you do after that?

A.      Checked the van, see if anything was in there,
and his bag was in there.  I grabbed it.  I never realized
he had money in his bag until I opened it and I was, like,
wow, this guy had a lot of money on him.

Q.      Yeah.

A.      *I know I did wrong.*  I know he's going to call
the police.  So I went over there in that vacant lot and I
waited.

(Emphasis added).

        On cross-examination, Forbes testified:

Q.      What -- when you pulled your gun lighter on
[CW], what effect did you think that would have on him?

A.      To drop me off at my destination.

Q.      And why do you think he would drop you off
after you pointed a gun lighter at him?

A.      I don't know.  *Maybe scare him, scare him at
the most.*  I mean, that's the only thing I want to do is get
dropped off.

Q.      And at that moment the best idea you had was to
pull a gun lighter?

A.      I didn't know.  Overreacted.

Q.      And you are aware that the gun lighter looks
exactly like a gun?

A.      It does, yes.

Q.     Tell the jury, describe the -- to the jury the way you were hitting [CW] when you were holding the gun in your hand.

A.     If I would have pistol whipped [CW] as they say there would have been some real serious marks on him.  But there was scratches.

Q.     So --

A.     *I grabbed him and that was it.*

Q.     So *describe the way you softly hit him with the grip of the fake gun.*

A.     No.  *I was trying to grab him.*

Q.     And describe to the jury how you were trying to grab [CW].

A.     *I'm trying to grab him by his shirt.*

. . . .

Q.     I want to be clear.  There was a series of questions that -- on direct examination you talked about some kind of distance from, you said from where you are to the door, and then you described turning around.  At what -- what were you talking about?  You said -- is that where you pulled the gun on [CW] is just outside the business, or excuse me, the beach park?

A.     Yes.

Q.     So your testimony -- what we just saw on the video when you take -- well, you saw yourself take the camera?

A.     Yes.

Q.     Is that the only time you had pulled the gun on [CW]?

A.     Correct.

Q.     And that -- *you pulled the gun on [CW] just --*

A.     *Just to force him to drop me off.*

. . . .

Q.     Okay.  So you pulled the gun on [CW] because you want to get to the beach park?

A.     Correct.

. . . .

Q.     Okay.  And then [CW] jumps out?

A.    He turns around.

Q.    Okay.  So he totally turns around and leaves?

. . . .

THE WITNESS:  Yes, ma'am.

BY [the deputy prosecuting attorney]:

Q.    And how far does he drive before he jumps out?

A.    He turns around.  As soon as he turns around, turns the car around, maybe 20 feet he stopped.

Q.    Okay.  And he jumps out?

A.    He starts -- he jumped out, yes.

Q.    Then you get in the car or you get into the driver seat?

A.    *When he tried to jump out, I tried to pull him back in so he could continue my drive.  That's when everything got out of hand.*

Q.    Okay.  At some point [CW] jumps out of the car?

A.    Right.

Q.    You jump into the driver's seat?

A.    Yup.

Q.    And you drive his car to the beach park?

A.    Yes, I did.

(Emphasis added).

The defense called no other witnesses.

By the agreement of the parties, with respect to the

Kidnapping charge, the Circuit Court instructed the jury:

> In Count 1 of the Indictment, the Defendant, EPHRIM FORBES, is charged with the offense of Kidnapping.

> A person commits the offense of Kidnapping if he intentionally or knowingly restrains a person with intent to terrorize that person.

> There are three material elements of the offense of Kidnapping, each of which the prosecution must prove beyond a reasonable doubt.

15

These three elements are:

    1.    That, on or about May 17, 2018 in the City and County of Honolulu, the Defendant restrained [CW]; and

    2.    That the Defendant did so intentionally or knowingly; and

    3.    That the Defendant did so with the intent to terrorize [CW].

    . . . .

    "Restrain" means to restrict a person's movement in such a manner as to interfere substantially with the person's liberty by means of force, threat, or deception.

(Format altered).

The jury found Forbes guilty as charged of Kidnapping and UCPV, as well as of Theft in the Fourth Degree as a lesser included offense of Robbery. However, the jury answered "No" to the special interrogatory: "Did the prosecution prove beyond a reasonable doubt that the Defendant did not commit Count 1 [Kidnapping or any of its included offenses] and Count 2 [Robbery or any of its included offenses] as part of a continuing and uninterrupted course of conduct?" Accordingly, the Circuit Court dismissed Count 2 under HRS § 701-109(1) (2014) (merger of offenses).[5]

---

[5]    See HRS § 701-109, which provides, in relevant part:

    **§ 701-109 Method of prosecution when conduct establishes an element of more than one offense.** (1) When the same conduct of a defendant may establish an element of more than one offense, the defendant may be prosecuted for each offense of which such conduct is an element. The defendant may not, however, be convicted of more than one offense if:
    . . . .

(continued...)

16

In addition, the jury answered "Yes" to the special interrogatory: "Has the prosecution proven beyond a reasonable doubt that the Defendant did not release [CW] voluntarily?" Accordingly, pursuant to HRS § 707-720, the circuit court sentenced Forbes to a 20-year term of imprisonment for Kidnapping as a class A felony,[6] as well as a 5-year term for UCPV, to be served concurrently.

This appeal followed.

## II. POINTS OF ERROR

Forbes asserts two points of error on appeal, contending that: (1) the Circuit Court plainly erred in failing to instruct the jury that the restraint necessary to support a Kidnapping conviction must be in excess of any restraint that is incidental to Forbes's intent to terrorize CW; and (2)

---

[5]     (...continued)
> (e) The offense is defined as a continuing course of conduct and the defendant's course of conduct was uninterrupted, unless the law provides that specific periods of conduct constitute separate offenses.

[6]     HRS § 707-720 includes:

> § 707-720 Kidnapping. . . .

> (2)    Except as provided in subsection (3), kidnapping is a class A felony.

> (3)    In a prosecution for kidnapping, it is a defense which reduces the offense to a class B felony that the defendant voluntarily released the victim, alive and not suffering from serious or substantial bodily injury, in a safe place prior to trial.

17

insufficient evidence was adduced at trial to support the

conclusion that Forbes did not voluntarily release CW.

III. APPLICABLE STANDARDS OF REVIEW

"As a general rule, jury instructions to which no

objection has been made at trial will be reviewed only for plain

error. An error will be deemed plain error if the substantial

rights of the defendant have been affected adversely."

Sheffield, 146 Hawaiʻi at 53, 456 P.3d at 126 (citation omitted).

> [A]lthough as a general matter forfeited assignments of
> error are to be reviewed under Hawaiʻi Rules of Penal
> Procedure (HRPP) Rule 52(b) plain error standard of review,
> in the case of erroneous jury instructions, that standard of
> review is effectively merged with the HRPP Rule 52(a)
> harmless error standard of review because it is the duty of
> the trial court to properly instruct the jury. As a result,
> once instructional error is demonstrated, we will vacate,
> without regard to whether timely objection was made, if
> there is a reasonable possibility that the error contributed
> to the defendant's conviction, i.e., that the erroneous jury
> instruction was not harmless beyond a reasonable doubt.

State v. Malave, 146 Hawaiʻi 341, 348, 463 P.3d 998, 1005 (2020)

(citation omitted; format altered).

With respect to the sufficiency of the evidence, it is

well-established that:

> [E]vidence adduced in the trial court must be
> considered in the strongest light for the prosecution when
> the appellate court passes on the legal sufficiency of such
> evidence to support a conviction; the same standard applies
> whether the case was before a judge or a jury. The test on
> appeal is not whether guilt is established beyond a
> reasonable doubt, but whether there was substantial evidence
> to support the conclusion of the trier of fact. Indeed,
> even if it could be said in a bench trial that the
> conviction is against the weight of the evidence, as long as
> there is substantial evidence to support the requisite
> findings for conviction, the trial court will be affirmed.
>
> Substantial evidence as to every material element of
> the offense charged is credible evidence which is of

> sufficient quality and probative value to enable a person of reasonable caution to support a conclusion. And as trier of fact, the trial judge is free to make all reasonable and rational inferences under the facts in evidence, including circumstantial evidence.

Sheffield, 146 Hawaiʻi at 53, 456 P.3d at 126 (citation omitted; format altered).

IV.   DISCUSSION

   A.   The Kidnapping Instruction

      A person can be convicted under Hawaii's Kidnapping statute if that person intentionally or knowingly restrains another person with the intent to do one of seven specified acts. HRS § 707-720, in its entirety, provides:

> **§ 707-720 Kidnapping.** (1) A person commits the offense of kidnapping if the person intentionally or knowingly restrains another person with intent to:
>
> (a)   Hold that person for ransom or reward;
>
> (b)   Use that person as a shield or hostage;
>
> (c)   Facilitate the commission of a felony or flight thereafter;
>
> (d)   Inflict bodily injury upon that person or subject that person to a sexual offense;
>
> (e)   Terrorize that person or a third person;
>
> (f)   Interfere with the performance of any governmental or political function; or
>
> (g)   Unlawfully obtain the labor or services of that person, regardless of whether related to the collection of a debt.
>
> (2)   Except as provided in subsection (3), kidnapping is a class A felony.
>
> (3)   In a prosecution for kidnapping, it is a defense which reduces the offense to a class B felony that the defendant voluntarily released the victim, alive and not suffering from serious or substantial bodily injury, in a safe place prior to trial.

19

Here, Forbes was prosecuted for Kidnapping under HRS § 707-720(1)(e), which proscribes intentionally or knowingly restraining another person with the intent to terrorize that person.

Citing Sheffield, which decided an appeal from a conviction for violating a different subpart of HRS § 707-720(1), Forbes argues that the Circuit Court should have instructed the jury that the restraint necessary to support a Kidnapping conviction based on the intent to terrorize another person must exceed any restraint that is incidental to the defendant's intent to terrorize the other person. Forbes did not request an instruction of this type at trial. Therefore, we review the Circuit Court's jury instructions for plain error.

In Sheffield, the defendant was convicted of Kidnapping under HRS § 707-720(1)(d), which proscribes intentionally or knowingly restraining another person with the intent to inflict bodily injury upon that person or subject that person to a sexual offense. 146 Hawai'i at 51, 456 P.3d at 124. The complaining witness in Sheffield testified that she was walking alone at night and that Sheffield followed her. She heard Sheffield say, inter alia, "I want to fuck you." Id. at 52, 456 P.3d at 125. Sheffield also said he "was going to knock [her] out and put his hands up near his face before taking a swing at [her]. [The

20

complaining witness] stated Sheffield missed her face because he was not a skilled fighter." Id. As the complaining witness turned to run away, Sheffield grabbed a loop on her backpack and pulled her towards some bushes, repeating "more of the fucking kind of stuff" and that "he was going to beat [her] up." Id. The complaining witness spun around, causing Sheffield to lose his grip on her backpack. She spun around again, and escaped. Id.

Sheffield was charged with Kidnapping under HRS § 707-720(1)(d). Sheffield was also charged with Assault in the Third Degree under HRS § 707-712(1)(a) (2014),[7] but that charge was dismissed before trial. Sheffield, 146 Hawai'i at 53, 456 P.3d at 126. The jury found Sheffield guilty of Kidnapping, and Sheffield appealed. On appeal, Sheffield argued that, "when kidnapping is the only count tried, the State must prove the defendant used a greater degree of 'restraint' than that incidentally used to commit the underlying unprosecuted assault in the third degree offense[,]" and that the jury should have

---

[7] HRS § 707-712(1)(a) provides in relevant part: "A person commits the offense of assault in the third degree if the person . . . [i]ntentionally, knowingly, or recklessly causes bodily injury to another person[.]"

been so instructed. Id. at 51, 456 P.3d at 124.[8] The supreme

court held that:

> [T]he "restraint" required to support a kidnapping
> conviction under HRS § 707-720(1)(d) is indeed restraint in
> excess of any restraint incidental to the infliction or
> intended infliction of bodily injury or subjection or
> intended subjection of a person to a sexual offense;
> therefore, the circuit court plainly erred in failing to so
> instruct the jury.

Id.

In large part, the supreme court based its holding in

Sheffield on the language, history, and structure of section

212.1 of the Model Penal Code (**MPC**) (Kidnapping), as well as

Hawaii's Kidnapping and Related Offenses statutes, HRS §§ 707-720

to 707-722 (2014). The supreme court analyzed and acknowledged

that Kidnapping under the MPC requires "substantial removal or

confinement," while the Hawai'i Penal Code requires "only the act

of 'restraint', defined to mean 'to restrict a person's movement

in such a manner as to interfere substantially with the person's

liberty' by various means or circumstances[.]" Sheffield, 146

Hawai'i at 56-57, 456 P.3d at 129-30. The supreme court noted:

> There was no evidence at [Sheffield's] trial regarding
> actual bodily injury or a sexual offense [as opposed to the
> complaining witness's testimony that Sheffield said he
> wanted to have sex with her and beat her up]. Where the
> defendant does not complete the underlying offense (whether

---

[8]     Sheffield cited, inter alia, three Hawai'i cases for the
proposition that "a defendant can be convicted of kidnapping and another
crime, where the restraint necessary to support the kidnapping conviction was
in excess of any restraint necessary to support a conviction for a
contemporaneously committed crime[.]" Sheffield, 146 Hawai'i at 54, 456 P.3d
at 128, citing State v. Hernandez, 61 Haw. 475, 605 P.2d 75 (1980) (per
curiam); State v. Halemanu, 3 Haw. App. 300, 650 P.2d 587 (1982); and State
v. Yamamoto, 98 Hawai'i 208, 46 P.3d 1092 (App. 2002).

> it be assault or sexual assault or some other offense),
> however, the MPC Commentators characterized prosecution
> solely for kidnapping as "abusive": "Where the underlying
> crime is not completed, prosecution for kidnapping instead
> of attempt may amount to an end run around the special
> doctrinal protections designed for uncompleted crimes."
> Commentary to § 212.1 at 221. Hawai'i law, however, allows
> prosecution for kidnapping without a completed offense.

Id. at 58 n.11, 456 P.3d at 131 n.11. The supreme court was concerned about "abusive" prosecutorial tactics — trying Sheffield for Kidnapping rather than an unprosecuted or uncompleted (attempted)[9] offense. Id. at 54-55, 456 P.3d at 126-27. The significance is often substantial. Kidnapping is a class A felony, unless "the defendant voluntarily released the victim, alive and not suffering from serious or substantial bodily injury, in a safe place prior to trial[,]" in which case it is a class B felony. See HRS § 707-720(2) and (3). The sentence for a class A felony is twenty years, whereas the sentence for a class B felony is ten years. See HRS §§ 706-659, 706-660 (2014). As an unprosecuted charge in Sheffield, Assault in the Third Degree is a misdemeanor, unless committed in a fight or scuffle entered into by mutual consent, in which case it is a petty misdemeanor. See HRS § 707-712(2). The sentence for a misdemeanor is one year; the sentence for a petty misdemeanor is thirty days. See HRS § 706-663 (2014).

---

[9]     "An attempt to commit a crime is an offense of the same class and grade as the most serious offense which is attempted." HRS § 705-502 (2014).

In Sheffield, there was evidence that the defendant told the complaining witness he wanted to have sex with her and beat her up, but there was no evidence that the defendant subjected the complaining witness to a sexual offense or actually injured her. The Sheffield court recited "a majority rule among the states:"

> [K]idnapping statutes do not apply to unlawful confinements or movements [i.e., restraint] "incidental" to the commission of other felonies.
>
> . . . .
>
> In these other jurisdictions, three formulations of the majority rule have emerged for determining whether a restraint or movement is "incidental" to another crime. In summary, the three tests for incidental movement or restraint are
>
>> (1) whether the confinement, movement, or detention was merely incidental to the accompanying crime or whether it was significant enough, in and of itself, to warrant independent prosecution.
>>
>> (2) whether the detention or movement substantially increased the risk of harm over and above that necessarily present in the accompanying crime.
>>
>> (3) when the restraint or movement was done to facilitate the commission of another crime, the restraint or movement must not be slight, inconsequential, and merely incidental to the other crime, or be the kind of restraint or movement inherent in the nature of the other crime. Under this test, the restraint or movement must have some significance independent of the other crime, in that it makes the other crime substantially easier to commit or substantially lessens the risk of detection.

Id. at 58-59, 456 P.3d at 131-32 (citations omitted; format altered). The supreme court adopted the majority rule and held that "the 'restraint' required to support a kidnapping conviction under HRS § 707-720(1)(d) is indeed restraint in excess of any

restraint incidental to the infliction or intended infliction of bodily injury or subjection or intended subjection of a person to a sexual offense[.]" Id. at 59, 456 P.3d at 132.

The supreme court stated that its holding in Sheffield was limited to prosecutions for Kidnapping under HRS § 707-720(1)(d), and did not address the restraint necessary to support a conviction for 'kidnapping' based on the other subsections of 707-720(1), including the one at issue in this case, HRS § 707-720(1)(e). Id. at 59 n.13, 456 P.3d at 132 n.13. The supreme court nevertheless observed: "The Commentary to HRS § 707-720 to -722 notes that 'restraint' is the conduct applicable to kidnapping (HRS § 707-720)[.]" Id. at 56, 456 P.3d at 129. HRS § 707-700 (2014) defines "restrain" as:

> to restrict a person's movement in such a manner as to interfere substantially with the person's liberty: (1) By means of force, threat, or deception; or (2) If the person is under the age of eighteen or incompetent, without the consent of the relative, person, or institution having lawful custody of the person.

The supreme court then stated:

> Based on the evidence in this case, the circuit court instructed the jury that "[r]estrain means to restrict a person's movement in such a manner as to interfere substantially with her liberty by means of force." Although the circuit court gave this instruction, no instruction was given regarding whether or not the substantial interference necessary for a kidnapping conviction was required to be in excess of the substantial interference with liberty that would be incidental to the infliction or intended infliction of bodily injury or the subjection or intended subjection of a person to a sexual offense.

Id. at 55-56, 456 P.3d at 128-29 (emphasis added). Thus, Sheffield is supportive of the proposition that a Kidnapping

25

conviction requires a finding that the amount of "restraint" employed by the defendant upon the complaining witness was "in excess of the substantial interference with liberty that would be incidental to the infliction or intended infliction of" any of the offenses described by the other subsections of 707-720(1).

In this case, Forbes was prosecuted for intentionally or knowingly restraining CW "with intent to . . . [t]errorize [him.]" HRS § 707-720(1)(e). Forbes could have been, but was not, charged with Terroristic Threatening in the First Degree (**Terroristic Threatening**), of which intent to terrorize is also an element.[10] HRS § 707-715 (2014) provides, in relevant part:

> **§ 707-715 Terroristic threatening, defined.** A person commits the offense of terroristic threatening if the person threatens, by word or conduct, to cause bodily injury to another person . . . or to commit a felony:
>
> > (1) With the intent to terrorize, or in reckless disregard of the risk of terrorizing, another person[.]

> HRS § 707-716 (2014) provides, in relevant part:

> **§ 707-716 Terroristic threatening in the first degree.** (1) A person commits the offense of terroristic threatening in the first degree if the person commits terroristic threatening:
>
> > (a) By threatening another person on more than one occasion for the same or a similar purpose;
>
> . . . .

---

[10] Forbes does not contend that, and we do not decide whether, the jury should have been instructed on terroristic threatening as a lesser included offense of kidnapping under HRS § 707-720(1)(e).

> (e) With the use of a dangerous instrument or a simulated firearm. For purposes of this section, "simulated firearm" means any object that:
>
> (i) Substantially resembles a firearm;
>
> (ii) Can reasonably be perceived to be a firearm; or
>
> (iii) Is used or brandished as a firearm[.]

Here, for example, Forbes admittedly brandished what he claimed was a cigarette lighter that resembled a gun — but which CW may have thought was a real gun — to "scare" CW. He also testified, in essence, that he grabbed CW's shirt to scare CW to get him to drop him off at the beach park. Under the supreme court's rationale in Sheffield, we conclude that the Circuit Court should have instructed the jury that to convict Forbes of kidnapping, it must find that Forbes restrained CW in excess of the substantial interference with liberty that would be incidental to the offense of Terroristic Threatening. See Sheffield, 146 Hawai'i at 55-56, 456 P.3d at 128-29.

Thus, we must address whether the Circuit Court's failure to give a Sheffield-type instruction was harmless beyond a reasonable doubt. See, e.g., Malave, 146 Hawai'i at 348, 463 P.3d at 1005. The supreme court has repeatedly held:

> Erroneous instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial[.] If there is such a reasonable possibility in a criminal case, then the error is not harmless beyond a reasonable doubt, and the judgment of conviction on which it may have been based must be set aside.

State v. Bovee, 139 Hawai'i 530, 537-38, 394 P.3d 760, 767-68 (2017) (quoting State v. Frisbee, 114 Hawai'i 76, 79-80, 156 P.3d 1182, 1185-86 (2007) (quoting State v. Gonsalves, 108 Hawai'i 289, 293, 119 P.3d 597, 601 (2005))).

Here, the evidence adduced at trial in support of the jury's finding that Forbes intentionally or knowingly restrained CW with the intent to terrorize CW would have been evidence sufficient to support a conviction for Terroristic Threatening. Although it is possible that the jury could have concluded that there was evidence beyond a reasonable doubt that Forbes restrained CW in excess of the substantial interference with liberty that would be incidental to the offense of Terroristic Threatening, there is a reasonable possibility that a jury could have concluded otherwise. Accordingly, we cannot conclude that the Circuit Court's failure to give the jury a Sheffield-type of instruction was harmless beyond any reasonable doubt.

B. The Sufficiency of the Evidence

Forbes argues that there was insufficient evidence to support the conclusion that he did not voluntarily release CW. The jury answered "Yes" to the special interrogatory: "Has the prosecution proven beyond a reasonable doubt that the Defendant did not release [the CW] voluntarily?" Viewed in the strongest light for the State, there was substantial evidence supporting the jury's finding. CW testified that he tried to run away from

28

Forbes twice. The first time, CW opened the door and took a step out of his van while holding his cash bag. Forbes hit CW with the grip of what appeared to be a handgun, grabbed CW's shirt under CW's arm, and pulled CW back into the van. After five minutes, CW tried to run away again, and was able to escape after leaving his cash bag on the floor of the van. We conclude that there was substantial evidence to support the jury's finding that Forbes did not voluntarily release CW. See State v. Mara, 102 Hawai'i 346, 356, 76 P.3d 589, 599 (App. 2003), cert. denied, 102 Hawai'i 333, 76 P.3d 576 (2003) ("The fact that Mara did not pursue [the complaining witness] after she escaped is not evidence of a release.").

V. CONCLUSION

Based on the reasons set forth above, the August 8, 2019 Judgment is vacated in part and affirmed in part. We vacate Forbes's Kidnapping conviction and otherwise affirm the Judgment. This case is remanded to the Circuit Court for further proceedings consistent with this Opinion.

On the briefs:

Walter J. Rodby,
for Defendant-Appellant.

Loren J. Thomas,
Deputy Prosecuting Attorney,
City and County of Honolulu,
for Plaintiff-Appellee.

/s/ Katherine G. Leonard
Presiding Judge

/s/ Clyde J. Wadsworth
Associate Judge

**OPINION BY HIRAOKA, J.**
**CONCURRING IN PART AND DISSENTING IN PART**

I concur that the evidence was sufficient to support the jury's finding that Forbes did not voluntarily release CW. But I would not find plain instructional error. Even if State v. Sheffield, 146 Hawai'i 49, 456 P.3d 122 (2020) applies to a prosecution for kidnapping under HRS § 707-720(1)(e) (intent to terrorize), in my view the trial court's failure to give a Sheffield-type instruction was harmless beyond a reasonable doubt.

In State v. Malave, 146 Hawai'i 341, 463 P.3d 998 (2020), a family court jury found Malave guilty of sexually assaulting his pre-teen stepdaughter over a two-year period. On appeal, Malave argued the family court did not have subject matter jurisdiction. HRS § 571-14(a) gave the family court exclusive jurisdiction "[t]o try any offense committed against a child by . . . any other person having the child's legal or physical custody." Id. at 349, 463 P.3d at 1006. The family court did not instruct the jury that it must find Malave had legal or physical custody of the complaining witness in order to find him guilty.

The supreme court found instructional error: "[W]hen a jury trial is conducted in family court in a case subject to HRS § 571-14(a), the jury should be instructed by way of a special interrogatory to find whether the defendant had physical or legal custody of the complaining witness." Malave, 146 Hawai'i at 349-50, 463 P.3d at 1006-07. However, the supreme court held that the error was harmless beyond a reasonable doubt:

> Where uncontradicted and undisputed evidence of jurisdiction is contained in the record, the trial court's failure to instruct the jury is harmless beyond a reasonable doubt. . . .
>
> "'Physical custody' means the physical care and supervision of a child." HRS § 583A-102. The evidence in the record . . . shows that Malave did have physical custody of [the complaining witness] for the reasons the ICA noted: [the complaining witness] lived with her mother, Malave, and [her] two half-siblings; Malave watched and cared for [the complaining witness] while her mother was at work; Malave

> cooked meals, did laundry, disciplined [the complaining witness], and sometimes helped her with homework; and [the complaining witness] was expected to follow Malave's rules and obey him. Failure to instruct the jury on jurisdiction was thus harmless beyond a reasonable doubt.

Id. at 350, 463 P.3d at 1007 (cleaned up).

Similarly, based on the undisputed trial evidence — Forbes's own testimony as well as corroborating testimonial and photographic evidence — I do not believe any reasonable jury could conclude that Forbes did not restrain CW "more than any restraint incidental to the intended terroristic threatening of the complaining witness." See Majority Opinion at 2.

At trial Forbes admitted to conduct — brandishing a "simulated firearm" (a cigarette lighter that resembled a handgun) — to threaten CW with bodily injury. That evidence would have been sufficient to support a conviction for terroristic threatening in the first degree. Here, Forbes admitted scaring CW **to restrain him in the taxi** so that CW would drive Forbes where CW did not want to go. But Forbes admitted doing **more** to restrain CW than just scaring him with a simulated firearm. When CW attempted to escape the first time, Forbes admitted grabbing CW's shirt to **physically** restrain him. That physical restraint was more than incidental to terroristic threatening in the first degree. Forbes admitted, "I tried to pull [CW] back in so he could continue my drive." CW testified, "when I tried to run away from the car [Forbes] used his gun and then the grip side, holding side, and hit my neck side, neck[.]" Photographs depicting CW's injuries were admitted into evidence without objection. In light of this evidence, I believe that no reasonable jury could find that Forbes did not restrain CW more than was incidental to his terroristically threatening CW with a simulated firearm.

For these reasons, I would find the trial court's alleged plain instructional error harmless beyond a reasonable doubt, and affirm the August 8, 2019 Judgment.

/s/ Keith K. Hiraoka
Associate Judge